DENNIS *v.* UNITED STATES.

No. 14.   Argued November 7, 1949.—Decided March 27, 1950.

*George W. Crockett, Jr.* argued the cause for petitioner. With him on the brief were *Earl Dickerson, David M. Freedman* and *Harry Sacher.*

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Campbell, Robert S. Erdahl* and *Harold D. Cohen.*

*Robert J. Silberstein* filed a brief for the National Lawyers Guild, as *amicus curiae,* urging reversal.

Mr. Justice Minton delivered the opinion of the Court.

The question we have for determination here is whether a challenge for cause to jurors on *voir dire* because of employment by the Federal Government should have been sustained under the circumstances of this case.

Petitioner was convicted of violating R. S. § 102, 2 U. S. C. § 192, for willfully failing to appear before the Committee on Un-American Activities of the House of Representatives in compliance with a subpoena duly served upon him. The Court of Appeals affirmed, 84 U. S. App. D. C. 31, 171 F. 2d 986. We granted certiorari limited to the question whether Government employees could properly serve on the jury which tried petitioner. 337 U. S. 954.

Petitioner voluntarily appeared before the House Committee on Un-American Activities which had under consideration two bills to outlaw the Communist Party. Petitioner was and is General Secretary of the Communist Party of the United States. On his voluntary appearance before the Committee, petitioner refused to answer questions as to his name and the date and place of his birth. The Chairman of the Committee directed that a subpoena be served forthwith upon petitioner, requiring him to appear before the Committee on April 9, 1947. On the appointed date petitioner sent a representative but did not appear in accordance with the subpoena. The Committee reported his refusal to appear to the House of Representatives, and the House adopted a resolution certifying the report of the Committee to the United States Attorney for the District of Columbia. Petitioner was subsequently indicted.

When the case was called for trial, petitioner made a motion for transfer upon the ground that he could not obtain a fair and impartial trial in the District of Columbia. In his affidavit supporting the motion, he posited

this contention mainly on the ground that Government employees, who comprise a large part of the District's population, are subject to Executive Order 9835, 12 Fed. Reg. 1935, providing standards for their discharge upon reasonable grounds for belief that they are disloyal to the Government of the United States. He argued that Government employees would be afraid to risk the charge of disloyalty or possible termination of employment which would allegedly flow from a vote for acquittal. The motion for a transfer was denied.

Both sides conducted further *voir dire* examination at the conclusion of the court's questioning of the panel. Attorney for petitioner questioned individually each member of the panel who indicated that he was employed by the Government. He then challenged for cause all Government employees. The court denied the challenge. Petitioner exercised two of his three peremptory challenges against Government employees. He exhausted all his peremptory challenges. Seven of the twelve finally selected were Government employees. Each of the seven expressed the belief that he could render a fair and impartial verdict.

Is petitioner entitled to a new trial because his challenge to the Government employees for cause was not sustained? The question of the presence of Government employees on District of Columbia juries is not a new controversy. It has been before this Court on three previous occasions. *Crawford* v. *United States,* 212 U. S. 183; *United States* v. *Wood,* 299 U. S. 123; *Frazier* v. *United States,* 335 U. S. 497. In the *Crawford* case the defendants were charged with a conspiracy to defraud the United States. The Court held that the statute prescribing the eligibility of jurors in the District of Columbia did not control the subject. The Court turned to the common law in force in Maryland when the District was formed, and found that a servant was subject to challenge

for cause at common law where the master was party to the case on trial. In such a case, bias would be implied as a matter of law. The Court concluded that it was error to deny a challenge for cause to a Government employee in a case to which the Government was a party.

In 1935 Congress, prompted by the paucity of qualified jurors which resulted from the *Crawford* decision, passed an Act redefining eligibility for jury service in the District of Columbia. After exempting certain classes, the Act provided: "All other persons, otherwise qualified according to law whether employed in the service of the Government of the United States or of the District of Columbia . . . shall be qualified to serve as jurors in the District of Columbia and shall not be exempt from such service . . . ." 49 Stat. 682, D. C. Code, § 11–1420 (1940).

The constitutionality of this Act was sustained in *United States* v. *Wood,* 299 U. S. 123, where the defendant was charged with petty larceny from a private corporation. The defendant contended that the presence of Government employees on the jury denied the right of trial by an impartial jury within the meaning of the Sixth Amendment to the Constitution of the United States. He pointed out that under the common law as expounded by Blackstone, a King's servant and therefore a Government employee could not serve on a jury, and he argued that this view was carried into the Sixth Amendment.

Chief Justice Hughes, speaking for the Court, meticulously examined the problem. He found that Blackstone's statement of disqualification had reference only to servants of private parties, and that there was no established practice with respect to the King's servants at common law. The Court was of the view that even if such a common law disqualification existed, Congress had power to remove it. Unlike the statute in the *Crawford* case, the 1935 Act left no doubt that Congress intended

to qualify Government employees as jurors. The constitutionality of such a declaration was presented for the first time. The opinion carefully emphasized that the Act left accused persons free to show the existence of actual bias. Only the question of implied bias was presented. The Court concluded that the guarantee of an impartial jury was not impaired, stating:

> "It is manifest that the Act was passed to meet a public need and that no interference with the actual impartiality of the jury was contemplated. The enactment itself is tantamount to a legislative declaration that the prior disqualification was artificial and not necessary to secure impartiality. . . . To impute bias as matter of law to the jurors in question here would be no more sensible than to impute bias to all storeowners and householders in cases of larceny or burglary." *United States* v. *Wood, supra,* 148–149, 150.

Only last term in *Frazier* v. *United States,* 335 U. S. 497, the problem of jury service by Government employees was reexamined. There the defendant was tried and convicted of violating the Narcotics Act by a jury of the District of Columbia composed entirely, due to circumstances fortuitous or otherwise, of Federal Government employees. Mr. Justice Rutledge, speaking for the Court, reexamined the rule of the *Wood* case that Government employees are not disqualified as a matter of law from serving on a jury in a case to which the Government is a party. Government employees were again held to be subject to challenge only for "actual bias."

It would be a work of supererogation to attempt to clarify the statement of the law after the *Wood* and *Frazier* cases. Some may doubt the wisdom of the Court's decision in laying down the rule, but there can be no doubt that this Court has spoken very clearly, not only once, but twice.

No question of actual bias is before us. The way is open in every case to raise a contention of bias from the realm of speculation to the realm of fact. In both the *Wood* and *Frazier* cases this Court stressed that while impaneling a jury the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor. *United States* v. *Wood, supra,* 133–134, 150; *Frazier* v. *United States, supra,* 511–512. We reaffirm those principles. In exercising its discretion, the trial court must be zealous to protect the rights of an accused. And we agree that this the court must do without reference to an accused's political or religious beliefs, however such beliefs may be received by a predominant segment of our population. Ideological status is not an appropriate gauge of the high standard of justice toward which our courts may not be content only to strive. But while one of an unpopular minority group must be accorded that solicitude which properly accompanies an accused person, he is not entitled to unusual protection or exception.

Petitioner asserts that in order to secure the constitutional guarantee of trial by an impartial jury all Government employees must be held, in the special circumstances of this case, to be biased as a matter of law. It is not contended that bias appears as a fact from the record. As far as it appears, the court was willing to consider any evidence which would indicate that investigatory agencies of the Government had recognized in the past or would take cognizance in the future of a vote of acquittal, but no such proof was made. Nor was there evidence with respect to the existence of a climate of opinion among Government employees that they would jeopardize their tenure or provoke investigation by such a verdict. Rather petitioner asks that bias be implied from the recitation of the following circumstances: He

is a Communist; the instigator of the charges is the Un-American Activities Committee which allegedly would take notice of a vote for acquittal; the issue in the case is contempt of Congress; in contempt cases the Government's interest is the vindication of a direct affront, as distinguished from its role in an ordinary prosecution. But petitioner primarily bases his case on a request, in effect, that judicial notice be taken of an aura of surveillance and intimidation which is said to exist in the District because of Executive Order 9835, outstanding at the time of the trial.

The "Loyalty Order," as it is popularly known, requires the investigation of all persons entering civilian employment with the United States; as to those already in service, heads of departments and agencies are charged with the duty of making certain that disloyal persons are not retained. Petitioner maintains that because of this Order, Government employees would be hesitant to vote for acquittal because such action might be interpreted as "sympathetic association" with Communism.

Of course, the Loyalty Order could be the subject of judicial notice. Such notice, however, would give only limited illumination. It is proper to observe that the Loyalty Order is not directed solely against Communists, and that the crime of which petitioner was convicted is not a crime peculiar to Communists. Further, the Loyalty Order preceded the instant trial only by about three months. It was promulgated by the President on March 21, 1947. This trial began on June 23, 1947, and was concluded on June 26, 1947. On May 9, 1947, the President submitted to Congress a request for an appropriation to carry out the Loyalty Order,[1] which was not

---

[1] H. R. Doc. No. 242, 80th Cong., 1st Sess. (1947); 93 Cong. Rec. 4977 (1947).

enacted into law until July 31, 1947.[2] It was not until August 18, 1947, that Standard Form 84, requesting certain pertinent information from each federal employee, was made available.[3]

The administrative implementation of Executive Order 9835, which was yet to come, was apparently not the subject of anticipatory fear by these jurors. Their answers to interrogatories on the influence of the Loyalty Order were categorically to the contrary.[4] We must credit these representations, and this is particularly so in the absence of any evidence which would indicate an opposite

[2] 61 Stat. 696, 700. See Investigations Subcommittee on Expenditures, Investigation of Federal Employees Loyalty Program, S. Rep. No. 1775, 80th Cong., 2d Sess. (1948).

[3] Federal Personnel Manual I2–4. In a press release dated November 7, 1947, the Civil Service Commission announced the appointment of the Loyalty Review Board. A statement of the Board with respect to its regulations was published on January 20, 1948. 13 Fed. Reg. 253.

[4] "Mr. McCABE: You are familiar with the Government loyalty oath investigation?

"Juror HOLFORD: I believe I am. I have heard something of it.

"Mr. McCABE: Do you feel that rendering a verdict of not guilty in this case, if you come to that conclusion, it would stop you, any criticism or embarrassment among your fellow employees?

"Juror HOLFORD: None whatsoever.

"Mr. McCABE: Or by your superiors?

"Juror HOLFORD: No.

"Mr. McCABE: You would not have any thought that would be taken as evidence of friendliness to communism?

"Juror HOLFORD: No; I am not worried about my job that way."

.       .       .       .       .

"Mr. McCABE: Now, Mr. Jones, you have heard, have you, of the loyalty test or loyalty investigation which is going on to test the loyalty of Government employees? Have you heard of that?

"Mr. JONES: Yes, I have.

"Mr. McCABE: Are you aware of the fact that one of the tests that might disqualify or prevent you from Government employment

opinion among Government employees. One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.

Ultimately, petitioner's contentions amount to this: Since he is a Communist, in view of all the surrounding circumstances an exception must be carved out of the rule laid down in the statute, and construed in *Wood* and *Frazier,* that there is no implied bias by reason of Government employment. Thus the rule would apply to anyone but a Communist tried for contempt of a congressional committee, but not to a Communist. We think the rule in *Wood* and *Frazier* should be uniformly applied. A holding of implied bias to disqualify jurors because of their relationship with the Government is no longer permissible. The Act makes no exception for distinctive circumstances. It states that: "All . . . persons . . . whether employed in the service of the Government of the United States or of the District of Columbia . . . shall be qualified to serve as jurors in the District of Columbia and shall not be exempt from such service . . . ." Preservation of the opportunity to prove

---

is friendly association with any Communist person or any Communist organizations?

"Mr. JONES: That would not. I am a Civil Service employee. I have taken an examination for my job.

"Mr. McCABE: Yes. Are you aware of the fact that, despite any Civil Service protection, still a finding that you were in friendly association with any Communist or Communist organization would render you ineligible to continue in your Government position?

"Mr. JONES: It would not.

"Mr. McCABE: What?

"Mr. JONES: It would not."

The replies of the other jurors were in a similar vein.

actual bias is a guarantee of a defendant's right to an impartial jury. We adhere to our holding that the enactment of the statute is within the power of Congress, and that therefore employees of the Federal Government are not challengeable solely by reason of their employment.

It follows that we are unable to conclude that the failure to sustain the challenge for cause denied petitioner an "impartial jury." "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *United States* v. *Wood, supra,* 145–146. In this case, no more than the trial court can we without injustice take judicial notice of a miasma of fear to which Government employees are claimed to be peculiarly vulnerable— and from which other citizens are by implication immune. Vague conjecture does not convince that Government employees are so intimidated that they cringe before their Government in fear of investigation and loss of employment if they do their duty as jurors, which duty this same Government has imposed upon them. There is no disclosure in this record that these jurors did not bring to bear, as is particularly the custom when personal liberty hinges on the determination, the sense of responsibility and the individual integrity by which men judge men.

The judgment is *Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE REED concurs in the opinion and judgment of the Court. He reads the Court's decision to mean that Government employees may be barred for implied

bias when circumstances are properly brought to the court's attention which convince the court that Government employees would not be suitable jurors in a particular case. Absent such a showing, however, Government employees may not be barred from jury service merely because they are Government employees.

MR. JUSTICE JACKSON, concurring in the result.

In but two ways could the Court avoid affirming the conviction of Dennis. One is to rescind the general rule established in *Frazier* v. *United States,* 335 U. S. 497, that a jury is, in contemplation of law "impartial," even when entirely composed of government employees. The other is to retain, and thereby strengthen, that general rule but create a special exemption for Communists.

I adhere with increasing conviction to my dissent in *Frazier* v. *United States, supra* at 514. The Court there dug a pit dangerous for civil liberties. The right to fair trial is the right that stands guardian over all other rights. Reference to the reports will show what otherwise one would not believe: that the Court, by a bare majority, held it to be entirely fair to try a person before a jury consisting solely of government employees, plus the fact that one juror and the wife of another worked in the office of the department head responsible for enforcement of the law charged to be violated. The common instinct of men for fair dealing and the experience of trial lawyers alike reject this holding. Whenever any majority can be mustered to overrule that weird and misguided decision, I shall be one of it.

But the way for the Court to get out of the hole it fell into with *Frazier* is not to dig another and worse one. We are actually urged to hold that the kind of jury a defendant may have depends upon his political opinions or affiliations. The offense for which Dennis was tried was

contempt of a Committee of Congress.  That is not an offense that touches the immediate security of the Nation. Nor does guilt or innocence depend upon defendant's political views or party membership.  Of course, he is, and the jury was bound to learn that he is, a prominent figure in the Communist Party.  But the same acts would be the same offense if he were an orthodox Democrat.  The sole ground for creating an exemption from the *Frazier* rule is that the defendant is a Communist, and Communists are now exceedingly unpopular in Washington.  I agree that this highlights the unfairness of the *Frazier* rule and provides reason for overruling it; but I do not agree that it justifies the proposed exception to that decision.

The *Frazier* doctrine was promulgated by a majority of the Court which well knew that its rule would apply to this type of case and in these times.  That decision was handed down on December 20, 1948, with this present case just around the corner.  Dennis had already been convicted and his conviction had been affirmed in highly publicized proceedings occurring only a few city blocks from us; and his petition for certiorari had been filed in this Court.  The four of us dissenting in *Frazier* warned specifically that the Government in these times is using its power as never before to pry into lives and thoughts of government employees.  All that is urged now is more of the same and there is nothing in this situation that should not have been within the contemplation of the Court when the *Frazier* case was decided the way it was. The proposal now is a partial repeal—for Communists only.

Courts should give to a Communist every right and advantage that they give to any defendant.  But it is inconceivable that being a Communist can entitle a defendant to more.  Let us picture the proposal in operation.  Two defendants are brought to trial for contempt of Congress.  One, a Communist, has defied the Un-

American Activities Committee. The other, a Republican, has defied the Committee investigating the State Department. Both make well-founded claims that the Executive branch of the Government is hostile to them; both ask to exclude its employees from the jury so they may be tried by persons under no obligation to their adversaries. The proposal is that the trial judge should grant the motion of the Communist and deny that of the Republican! What then becomes of equal justice under law?

It is true that Communists are the current phobia in Washington. But always, since I can remember, some group or other is being investigated and castigated here. At various times it has been Bundists and Germans, Japanese, lobbyists, tax evaders, oil men, utility men, bankers, brokers, labor leaders, Silver Shirts and Fascists. At times, usually after dramatic and publicized exposures, members of these groups have been brought to trial for some offense. I think that none of them at such times ever should be forced to defend themselves against the Government's accusations before the Government's employees. But so long as accused persons who are Republicans, Dixiecrats, Socialists, or Democrats must put up with such a jury, it will have to do for Communists.

MR. JUSTICE BLACK, dissenting.

The petitioner, Dennis, was convicted of wilfully refusing to give testimony before the House Committee on Un-American Activities. The evidence against him was exceptionally strong. But no matter how strong that evidence, he had a constitutional right to have it passed on by an impartial jury.[1] No juror can meet the test

---

[1] The Sixth Amendment provides that defendants charged with crimes in federal courts "shall enjoy the right to . . . trial, by an impartial jury." And see *Tumey* v. *Ohio*, 273 U. S. 510, 535: "No

of "impartiality" if he has good reason to fear that a vote for acquittal would subject him to harassing investigations and perhaps cost him his job. On this ground the government employees called for jury duty were challenged for cause by petitioner. I am convinced that denial of this challenge deprived Dennis of an impartial jury.

Although each juror asserted that he or she could vote for acquittal without fear of adverse consequences, that cannot be accepted as conclusive evidence of impartiality. The test of bias sufficient to exclude a juror for cause is not what the particular juror believes he could do. Long ago Chief Justice Marshall ruled that a person "may declare that he feels no prejudice in the case, and yet the law cautiously incapacitates him from serving on the jury; because it suspects prejudice; because in general, persons in a similar situation, would feel prejudice." 1 Burr's Trial 414, 415, 25 Fed. Cas. 14,692g, at p. 50. And this Court, while recognizing that persons of the "highest honor and greatest self-sacrifice" would not be influenced by fear of financial losses, has said that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey* v. *Ohio,* 273 U. S. 510, 532.[2]

We did not depart from the "average man" test in *United States* v. *Wood,* 299 U. S. 123, or *Frazier* v. *United States,* 335 U. S. 497. Those cases involved convictions

matter what the evidence was against him, he had the right to have an impartial judge." This case related to financial interests of a mayor trying defendants, but the principles there declared are equally applicable to jurors who must judge the guilt or innocence of a defendant.

[2] See note 1, *supra.*

for theft and dope-peddling. They did hold that proof of mere governmental employment was not enough, standing alone, automatically to impute disqualifying bias in every criminal proceeding brought by the Federal Government. But both opinions clearly indicated that "particular issues or circumstances" might require exclusion of government employees in order to assure an impartial jury.[3] In complete harmony with the principle declared in the *Burr* and *Tumey* cases, our *Wood* opinion cautioned that a government employee could be disqualified if "in view of the nature or circumstances of his employment, or of the relation of the particular governmental activity to the matters involved in the prosecution, or otherwise, he had actual bias . . . ."[4] 299 U. S. at 134. And the *Frazier* opinion emphasized that these factors would support disqualification of government employees for "actual bias" without proof of "prejudice in the subjective sense." 335 U. S. at 510–11, n. 19.

Special circumstances of the type supporting disqualification under these decisions are, in my judgment, clearly shown by this record. The difficulty of securing an impartial jury at all is revealed by the number of potential jurors who felt that Dennis's position as Secretary of the Communist Party in this country would alone prevent

---

[3] In the *Frazier* case one juror and the wife of another were employed in the Department of Treasury, which was charged with enforcing the anti-narcotic laws. This Court did not decide whether such employment would distinguish these jurors from other government employees sufficiently to support a timely challenge, because the only special challenge raising this ground was belatedly made in a motion for new trial.

[4] The Court also stated that bias could not be imputed "simply by virtue of governmental employment, without regard to any actual partiality growing out of the nature and circumstances of particular cases." 299 U. S. at 149.

their giving him a fair trial.[5]   And the prevailing pattern of loyalty investigations and threatened purges makes it wholly unrealistic to expect government employees to enter the jury box with that quality of disinterestedness essential to complete impartiality.

The reasons urged for disqualifying government employees were first presented to the trial court in an affidavit supporting petitioner's motion for change of venue. The sworn allegations of that affidavit were never denied by the Government.   In essence, the affidavit pointed out that all federal employees were under constant scrutiny by various agencies and congressional committees for possible sympathy with Communists or with affiliated organizations; that under Executive Order 9835, issued following vigorous demands by the congressional committee which had initiated the prosecution of Dennis, any of these employees would lose his job if a "loyalty test" revealed "reasonable grounds" for belief that he was disloyal; that members of the same committee had stated that anything less than imposition of maximum punishment on Dennis would expose the persons responsible therefor to charges of disloyal sympathy with Commu-

---

[5] The difficulty of obtaining an impartial jury in cases where popular indignation is aroused became manifest during World War I. Judge Amidon, a veteran trier of Espionage Act cases, described his experiences as follows:

"For the first six months after June 15, 1917, I tried war cases before jurymen who were candid, sober, intelligent business men, whom I had known for thirty years, and who under ordinary circumstances would have had the highest respect for my declarations of law, but during that period they looked back into my eyes with the savagery of wild animals, saying by their manner, 'Away with this twiddling, let us get at him.'   Men believed during that period that the only verdict in a war case, which could show loyalty, was a verdict of guilty."   Quoted in Chafee, Free Speech in the United States 70 (1941 ed.).

nism; [6] and that consequently a vote for acquittal would jeopardize the job of any government employee so voting.[7] Petitioner again cited the "loyalty test" in challenging for cause all governmental employees called as jurors, although he did not bother to reargue the facts because his reasons were "clear to us all." Thus petitioner called the trial judge's attention to substantial facts in support of his challenges.

---

[6] In this connection the affidavit asserted that committee members "have stated openly on the floor of the House of Representatives that they demand a prosecution and conviction of, and the imposition of the maximum punishment on this defendant. They have charged that anything less would open the persons responsible therefor to a charge of disloyalty, and sympathy to Communism."

In oral argument on the motion for change of venue and an accompanying motion for continuances, counsel elaborated on one facet of this charge by reading from the Congressional Record a colloquy between a member of the committee and other congressmen. The substance of the colloquy was that the Attorney General should be impeached unless he obtained quick trials of Dennis and others charged with contempt by the committee. 93 Cong. Rec. 3815–3816.

[7] The affidavit read in part: "The enormous consequences of the Executive Order referred to above make it absolutely impossible to secure a fair and impartial trial in the District of Columbia for a leader of the Communist Party, particularly when the charge against him is laid by the Committee on Un-American Activities. The finding of disloyalty involves not only discharge from employment but a permanent branding as a disloyal and undesirable person, endangering the possibility of earning a livelihood in the future. No individual can be expected lightly to take the risk of incurring such consequences to himself, his family and his associates. The meaning of 'sympathetic association' is undefined in the Executive Order and there is no assurance that it may not be construed by the Attorney General to include a recognition of the rights of a member of the Communist Party. And even if the Attorney General himself would not so construe it, it is impossible to assume that persons selected for jury duty will run the risk of a charge of sympathy with Communism flowing from voting for an acquittal of so prominent a leader of the Communist Party."

To say that employees of the United States could meet objective tests of complete impartiality in the trial of cases like this is to disregard human nature. Probably at no period of the nation's history has the "loyalty" of government employees been subjected to such constant scrutiny and investigation by so many government agents and secret informers. And for the past few years press and radio have been crowded with charges by responsible officials and others that the writings, friendships, or associations of some government employee have branded him "disloyal." Government employees have good reason to fear that an honest vote to acquit a Communist or anyone else accused of "subversive" beliefs, however flimsy the prosecution's evidence, might be considered a "disloyal" act which could easily cost them their job. That vote alone would in all probability evoke clamorous demands that he be publicly investigated or discharged outright; at the very least it would result in whisperings, suspicions, and a blemished reputation.

In the *Wood* case this Court regarded as "far-fetched and chimerical" the suggestion that no government employee could have voted for acquittal of theft without endangering his job. I agree. But under the circumstances here it seems equally "far-fetched and chimerical" to suggest that government employees, however convinced of innocence, would feel completely free to acquit a defendant charged with disobeying a command of the Committee on Un-American Activities. My belief is that no defendant charged with such an offense, whatever his political affiliation, should be forced to accept a government employee as a juror. Nor should the Government want such an unfair advantage. Of course this advantage makes convictions easier. That is precisely what the Sixth Amendment was designed to prevent. It com-

mands impartiality in the jury-box. Impartiality cannot survive in the shadow of threats to a juror's reputation and livelihood.

MR. JUSTICE FRANKFURTER, dissenting.

Acquiescence in a precedent does not require approval of its extension. Although I adhere to the views expressed by MR. JUSTICE JACKSON for the minority in *Frazier* v. *United States,* 335 U. S. 497, 514, I do not urge that it be overruled. But in abiding by it I need not assent to enlarging the areas of its undesirability. The constitutional command for trial by an "impartial jury" casts upon the judiciary the exercise of judgment in determining the circumstances which preclude that free, fearless and disinterested capacity in analyzing evidence which is indispensable if jurymen are to deal impartially with an accusation. The judgment that a court must thus exercise in finding "disqualification for bias" of persons who belong to a particular class is a psychological judgment. It is a judgment founded on human experience and not on technical learning. And so it does not follow that merely because government employees are not automatically disqualified as jurors in every prosecution in the District of Columbia they should not be disqualified in prosecutions that are deemed to concern the security of the nation.

The reason for disqualifying a whole class on the ground of bias is the law's recognition that if the circumstances of that class in the run of instances are likely to generate bias, consciously or unconsciously, it would be a hopeless endeavor to search out the impact of these circumstances on the mind and judgment of a particular individual. That is the reason why the influences of consanguinity or of financial interest are not individually canvassed. Law as a response to life recognizes the operation of such

influences even though not consciously or clearly entertained. The appearance of impartiality is an essential manifestation of its reality. This is the basic psychological reason why the Founders of this country gave the judiciary an unlimited tenure. Impartiality requires independence, and independence, the Framers realized, requires freedom from the effect of those "occasional ill-humors in the society," which as Alexander Hamilton put it in The Federalist are "the influence of particular conjunctures." The Federalist, No. 78 at 400 (Beloff ed. 1948).

One of the greatest of judges has assured us that "Judges are apt to be naif, simple-minded men." Holmes, Collected Legal Papers 295. Only naiveté could be unmindful of the force of the considerations set forth by MR. JUSTICE BLACK, and known of all men. There is a pervasiveness of atmosphere in Washington whereby forces are released in relation to jurors who may be deemed supporters of an accused under a cloud of disloyalty that are emotionally different from those which come into play in relation to jurors dealing with offenses which in their implications do not touch the security of the nation. Considering the situation in which men of power and influence find themselves through such alleged associations, it is asking more of human nature in ordinary government employees than history warrants to ask them to exercise that "uncommon portion of fortitude" which the Founders of this nation thought judges could exercise only if given a life tenure. The Federalist, *supra.*

A government employee ought not to be asked whether he would feel free to decide against the Government in cases that to the common understanding involve disloyalty to this country. Questions ought not to be put to prospective jurors that offer no fair choice for answer.

Men ought not to be asked in effect whether they are brave or wholly indifferent to the enveloping atmosphere. They should not be asked to confess that they are weaklings nor should it be assumed that they are fully conscious of all the pressures that may move them. They may not know what judges of considerable forensic experience know, that one cannot have confident knowledge of influences that may play and prey unconsciously upon judgment. See, *e. g.*, Mr. Justice Oliver in *Rex* v. *Davies*, [1945] 1 K. B. 435, 445. The well-known observations of Mr. Justice Holmes on these psychological influences are here pertinent: "This is not a matter for polite presumptions; we must look facts in the face. Any judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." *Frank* v. *Mangum*, 237 U. S. 309, 345, 349. Nor is it irrelevant to note that we are living in a time when inroads have been made on the secrecy of the jury room so that, upon failure to agree, jurors are subjected to harassment to disclose their position in the jury room. Ought we to expose our administration of criminal justice to situations whereby federal employees must contemplate inquisitions into the manner in which they discharged their juror's oath?

To conclude that government employees are not disqualified in prosecutions inherently touching the security of the Government, at a time when public feeling on these matters is notoriously running high, because they are not *ipso facto* disqualified from sitting in a prosecution against a drug addict or a petty thief, is to say that things that are very different are the same. The doctrine of the *Frazier* case does not require such disregard of the relevant. To recognize the existence of what is characterized as a phobia against a particular group is not to discriminate in its favor. If a particular group, no matter what its beliefs,

is under pressure of popular hostility, exclusion of potential jurors peculiarly susceptible to such pressure is not an expression of regard for political opinions but recognition by law of the facts of life. It does not follow that because members of different but respected political parties can sit in judgment upon one another where punishment is involved, all members of such parties, no matter what their relation to an operating bias, can freely and fairly sit in judgment upon those belonging to an ostracized group.

Let there be no misunderstanding. To recognize the existence of a group whose views are feared and despised by the community at large does not even remotely imply any support of that group. To take appropriate measures in order to avert injustice even towards a member of a despised group is to enforce justice. It is not to play favorites. The boast of our criminal procedure is that it protects an accused, so far as legal procedure can, from a bias operating against such a group to which he belongs. This principle should be enforced whatever the tenets of the group—whether the old Locofocos or the Know-Nothings, the Ku Klux Klan or the Communists. This is not to coddle Communists but to respect our professions of equal justice to all. It was a wise man who said that there is no greater inequality than the equal treatment of unequals.

We are concerned with something far more important than sustaining a particular conviction. Many and conflicting are the criteria by which a society is to be deemed good, but perhaps no test is more revealing than the characteristics of its punitive justice. No single aspect of our society is more precious and more distinctive than that we seek to administer criminal justice according to morally fastidious standards. These reveal confidence in our institutions, respect for reason, and loyalty to our profes-

sions of fairness. The powerful claim in behalf of our civilization represented by our system of criminal justice will be vindicated and strengthened if those who in the popular mind appear to threaten the very existence of the Government are tried by citizens other than those in the immediate employ of the Government at the seat of Government.