941 F.2d 1211
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Denny YAKAS, Plaintiff-Appellant,
v.
KMART CORPORATION, d/b/a Kmart Discount Department Store #
9525, Defendant-Appellee.
 No. 90-3978.
 United States Court of Appeals, Sixth Circuit.
 Aug. 26, 1991.
 
 1
 Before NATHANIEL R. JONES and SUHRHEINRICH, Circuit Judges, and TODD, District Judge.*
 
 
 2
 PRE CURIAM.
 
 
 3
 Plaintiff-appellant Denny Yakas appeals judgment for the defendant-appellee K-Mart Corporation in this diversity action for personal injury. For the reasons that follow, we affirm.
 
 I.
 
 4
 Yakas filed this action on September 19, 1989, for personal injuries arising out of an accident alleged to have occurred on June 27, 1988, at the K-Mart store in Norwalk, Ohio. On that date, Yakas was shopping in the automotive section for some motor oil. After turning a corner in an aisle, he allegedly hit his head on the wheel or tire of a utility trailer display that extended into the aisle.
 
 
 5
 After the incident, Yakas complained of dizziness and nausea. He apparently searched for a store employee to report the accident. Eventually he encountered a store employee who called a manager. The manager completed an incident report and indicated that Yakas appeared to be dizzy. Yakas also testified that when he left the store, he vomited several times in the parking lot.
 
 
 6
 A few hours after leaving the K-Mart store, while driving on the Ohio Turnpike, he reportedly began to experience headaches, dizziness, nausea and flashes of light. Yakas immediately sought medical attention and was driven by his girlfriend, Pamela Welty, to St. John Medical Center. After several tests, Yakas was diagnosed with a concussion and post-concussion syndrome. He was kept for observation at the hospital for three days. Apparently Yakas' symptoms continued and he stayed in Steubenville, Ohio for a month while he consulted with a neurologist and an eye specialist.
 
 
 7
 After the accident, Yakas allegedly experienced severe anxiety, depression, and panic attacks. He sought medical attention in Salem, New Hampshire Emergency Clinic and later, upon his return home to Virginia, he sought treatment from Dr. Peters at the Virginia Neurological Clinic. Dr. Peters referred Yakas to Dr. Schiavone who treated him for panic attacks, stress and anxiety. Yakas also sought treatment from a Dr. Choi for photophobia and blurred vision.
 
 
 8
 On August 16, 1990, this case proceeded to trial. During voir dire, Yakas sought to have a juror excluded for cause. He alleged that she had demonstrated bias by expressing some doubt as to her ability to be impartial as regards damages other than out-of-pocket losses. This motion was overruled by the court.
 
 
 9
 At trial, Yakas attempted to testify as to certain photographs he had taken of a tractor trailer display he had seen in other K-Mart stores in Virginia Beach and in Washington. After hearing objections and argument, the trial court excluded the evidence because it did not portray the actual scene of the injury and there was insufficient evidence to show that it was similar to the scene of the accident. Apparently, the court did allow some questioning of Yakas on cross-examination regarding the photographs and admitted a photocopy of a trailer, which was also not a picture of the accident scene.
 
 
 10
 As part of its case, Yakas put on a Sgt. William A. Smith, a long-time friend of Yakas, in order to testify as to the "change" which had taken place in Yakas since the accident. During cross-examination by the defendant, defendant's counsel asked Sgt. Smith if he was familiar with an incident in which Yakas allegedly hit his girlfriend. Defendant's counsel again made reference to alleged violence between Yakas and his girlfriend in his closing argument.
 
 
 11
 During deliberations, the jury sent a written question to the court which read as follows: "Does Mr. Yakas have to prove he hit his head?" Appellant's Brief (quoting Trial Record at 355). The court answered this question by telling them to rely on the evidence they heard and their impressions. The jury later submitted its verdict in answer to specific interrogatories. In sum, the jury found that Yakas suffered no damages, and that neither party had been negligent. The verdict was therefore entered in favor of the defendant.
 
 
 12
 After trial Yakas moved for a new trial alleging that the district court erred in (1) failing to exclude the juror counsel had objected to for cause; (2) failing to allow plaintiff to introduce photos of the trailer display taken at other K-Mart stores; (3) failure to exclude allegedly prejudicial references to violence between Yakas and his girlfriend Pamela Welty; and (4) finding that the jury verdict was not against the weight of the evidence. The trial court overruled each of these objections and denied the motion for new trial. This timely appeal followed.
 
 II.
 
 13
 Yakas' first contention is that the trial court erred in failing to exclude a juror for cause upon motion by the plaintiff. A litigant who advances a challenge to excuse a prospective juror for cause has the burden of persuading the court that the prospective juror lacks impartiality. City of Cleveland v. Cleveland Electric, 538 F.Supp. 1240, 1250-51 (N.D.Ohio 1980) (citing Irvin v. Dowd, 366 U.S. 717, 723 (1961)). In order to meet its burden the challenger must "raise a contention of bias from the realm of speculation to the realm of fact." Dennis v. United States, 339 U.S. 162, 168 (1950). We review a trial court's determination with regard to the sufficiency of a challenge to a prospective juror for abuse of discretion. City of Cleveland, 538 F.Supp. at 1250 (citing Dennis, 339 U.S. at 168); Cox v. General Electric Company, 302 F.2d 389, 391 (6th Cir.1962).
 
 
 14
 Yakas cites the following exchange during voir dire in order to demonstrate the juror's bias.
 
 
 15
 Q. The only other, I think, question I have for now is that, as I indicated to you at the outset, we'll be asking for damages, in terms of money damages, and the Court will instruct you on what kind of money damages are available. Not all the money damages are going to be medical bills that Mr. Yakas paid for. Some will be for the problems he sustained. Anyone who feels they have some reason that they would not be able to award money damages for the problems that Mr Yakas has been dealing with over the last couple of years?
 
 
 16
 And to give you an example, my aunt sat on a jury and said she couldn't get [sic] anything other than what someone lost out of pocket, that she would not give pain and suffering, or any other kind. Anyone here who has a similar philosophy?
 
 
 17
 Miss Bremer, you kind of were sitting there looking a bit doubtful--do you have a feeling about that? It is kind of important to know, I want my client to have a fair jury here.
 
 
 18
 A. I think I might have a feeling along those lines.
 
 
 19
 Q. You could not give money damages for pain and suffering?
 
 
 20
 A. Not so much that I couldn't, but it might be harder to come by.
 
 
 21
 Q. You think that would interfere with your ability to be fair and impartial, for Mr. Yakas' benefit?
 
 
 22
 A. It might.
 
 
 23
 Q. It might?
 
 
 24
 A. (nodded affirmatively).
 
 
 25
 Q. I really appreciate your being honest with us.
 
 
 26
 J.App. at 56-57. Based solely on this exchange, Yakas asserts that the juror was biased and failure to exclude her for cause was error. See United States v. Gordon, 253 F.2d 177, 185 (7th Cir.1958) (finding reversible error for failing to dismiss a juror for cause).
 
 
 27
 The problem with Yakas' argument is that he simply does not cite all the relevant testimony during voir dire. In fact, after the above exchange, the following took place:
 
 
 28
 Q. Mrs. Bremer, you indicated that, I don't know if you are saying absolutely no, or you just want to see the evidence, of course, about pain and suffering, are you telling us if the plaintiff not only proves all those things we talked about, liability, and he didn't cause it, that K-Mart was negligent, all those things, and his negligence could be the cause of his injury, are you saying you'd be able or unable to find non-economic losses? In other words, medical bills, I assume those sorts of the economic losses you will see and, also, hear testimony that he is saying he cannot do various things, will you be able to find damages or would you simply be unable to do it?
 
 
 29
 A. After listening, I think I could.
 
 
 30
 J.App. at 49-50. The court clearly and unequivocally credited this second exchange as evidence that Ms. Bremer could be fair and impartial. See J.App. at 40. Thus, such a finding on credibility was clearly within the discretion of the trial judge and therefore there was no error in refusing to dismiss her for cause. Reynolds v. United States, 98 U.S. 145, 156-57 (1878) (it is not error for a trial court not to dismiss a juror for cause who states, to the court's satisfaction, that he or she will be impartial upon hearing the evidence).
 
 III.
 
 31
 At trial, Yakas' counsel attempted to introduce into evidence a number of photographs which he had taken of allegedly similar trailer displays from K-Mart stores located in Virginia and Washington. The defendant objected as Yakas sought to introduce the photos as a representation of the height and location of the display in the store in Ohio where the accident occurred. The trial court excluded the photos, finding them to be "too different" from the accident scene to be reliable. Yakas contends that the trial court erred in refusing to allow the photos into evidence.
 
 
 32
 In this circuit, the admissibility of photographs is predicated upon a two-part showing: (1) that what the photos purport to depict is relevant to an issue at trial, and (2) they are an accurate representation of the circumstances of the scene in question. See United States v. Hobbs, 403 F.2d 977, 978-79 (6th Cir.1968). A photograph that is adequately identified as correctly portraying the conditions as they existed as of the time of the accident is admissible even if taken at some distance in time from when the event occurred. Jenkins v. Associated Transport, Inc., 330 F.2d 706, 710 (6th Cir.1964). However, "[w]hether such exhibits are sufficiently identified as to be reliable evidence is usually a matter within the discretion of the trial judge." Id. In addition, "where photographs are offered to show distances, relevant sizes, or locations of objects, much more convincing proof of their accuracy is required than in ordinary cases." 29 Am.Jur.2d 793 at 873 (1967).
 
 
 33
 In his memorandum denying Yakas' motion for new trial, Judge Walinski addresses Yakas' argument on this issue as follows:
 
 
 34
 Mr. Yakas also seeks a new trial on the grounds that the Court improperly excluded pictures taken by Mr. Yakas of similar trailer displays located in other K-Mart stores. He argues that, without these pictures, the jury was unable to see that Mr. Yakas could have hit his head on the trailer display. However, no evidence was offered to show that the displays in the pictures were at the same height or protruded into the aisle the same distance as did the display in the Norwalk store [where the accident occurred].
 
 
 35
 J.App. at 41. We find the court's reasoning to be supported by the evidence and that the court did not abuse its discretion in excluding the photos.[1]
 
 
 36
 Yakas also contends that the district erred in allowing the defendant to cross-examine him on the photos which were not in evidence. It appears the trial court did allow the defendant to cross-examine Yakas on the photos, though they were not admitted into evidence. See Trial Record at 187-92.[2] After defendant's cross-examination, Yakas again sought to admit the photos, arguing that they had been referred to in the cross-examination. However, the court refused to allow their admission, and adhered to its prior ruling. While we find the trial judge's continued exclusion of the photos after allowing cross-examination with respect to them was error, Yakas fails to demonstrate any prejudice. Yakas merely asserts that the photos might have demonstrated to the jury that he could have hit his head on the display in the actual store. But Yakas made no showing as to why he did not seek to introduce photos of the actual site, nor did he suggest that obtaining such photos would have been impossible or even difficult. Further, even if the excluded photos could have shown that Yakas could have hypothetically hit his head on a trailer display, without a demonstration that the circumstances in the photos were similar to those in the Norwalk store, he still would not have shown he hit his head on the trailer display in this case.
 
 
 37
 Yakas further argues that the "error" committed by the trial judge in excluding his photos, and allowing cross-examination with regard to those excluded photos was exacerbated when the court allowed the admission of a photocopy of a photo of a trailer display introduced by the defendant. See J.App. at 25. We disagree.
 
 
 38
 Before defendant's exhibit was admitted, defendant's counsel laid a foundation by questioning Mr. John Tsacoumangos, the store manager of the K-Mart where the accident occurred, as to whether the photo accurately depicted the kind of trailer that was displayed in his store. See Trial Record at 279-80. In summing up this foundation, counsel stated:
 
 
 39
 Q. Maybe this is repetition, but I want to make sure we have it in the record, Ex. C [the photocopy], is that a fair and accurate representation of what the trailer was, a similar trailer that would have been on display in the K-Mart store that Mr. Yakas claims to have hit?
 
 
 40
 A. Yes.
 
 
 41
 Trial Record at 280. Thus defense counsel laid enough of a foundation to demonstrate the requisite reliability for admission of photograph. Later, on cross-examination, the court permitted Yakas to explore whether the defendant's photo was of the exact display or not, and whether the photo had been altered by the K-Mart display department. See Trial Record at 280-283.
 
 
 42
 Further, it would seem that the admission of this photo eliminated any prejudice to Yakas that might have resulted from the exclusion of the other photos, assuming their exclusion was error, because it permitted the jury to see and hear testimony regarding whether it was possible for Yakas to have hit his head on the display. The trial judge probably should have excluded all the photos, or admitted all the photos, as neither of the parties provided photos of the actual accident cite. However, in allowing the defendant's photo but not plaintiffs, the court did allow the jury to get a view of a trailer display. At the same time, by excluding the Yakas' photos, the court did not allow Yakas to suggest a similarity between the displays in his photos and the display in the Norwalk store without demonstrating that the displays depicted were actually similar. This may have been the fairest way to handle potentially confusing or misleading evidence. We therefore find no reversible error with regard to the district court's treatment of the photographic evidence.
 
 IV.
 
 43
 Yakas' third contention is that the trial court erred by failing to admonish the jury to disregard certain questions by defendant's counsel regarding alleged violence between Yakas and his girlfriend Pamela Welty. Once again, Yakas cites certain segments of testimony which on their own might suggest prejudice. However, examination of the full transcript suggests otherwise.
 
 
 44
 The alleged infractions by defense counsel took place during the recross-examination of Sgt. William Smith, a longtime friend of Yakas. Sgt. Smith was put on the stand by Yakas for the purpose of testifying to changes in Yakas' mood, behavior and personality after his alleged accident. Yakas relies on the following testimony to support his contention that certain questions by defense counsel resulted in prejudice:
 
 
 45
 Q. You never asked and [Yakas] never told you what was going on, why he left?
 
 
 46
 A. No.
 
 
 47
 Q. You don't know if there were any problems going on, any personality change, whether that was a situation where his wife said get out, or he said I am leaving?
 
 
 48
 A. I don't know why he left, sir. I know his wife told my wife they were separated, and she told me. I don't know what happened to make them separate.
 
 
 49
 Q. You know of anything, of any violent traits, with Pamela Welty or anything that--
 
 
 50
 [Objection][3]
 
 
 51
 A. I don't know what you are talking about.
 
 
 52
 Trial Record at 254-55. Without the context in which this testimony arose, it is possible to understand this testimony as somewhat problematic. However, our review of the full transcript suggests that it was in line with direct examination testimony of this witness by Yakas himself.
 
 
 53
 The purpose of putting this witness on was to show that Yakas had changed since his accident. He was asked questions with regard to changes in his mood, Yakas' temperament and with regard to alleged changes in his speech. On cross-examination, the defendant tried to demonstrate that Sgt. Smith did not know Yakas well and also that there were other possible reasons for Yakas' alleged symptoms of anxiety, depression, and panic attacks besides the accident. These included questions regarding the recent break-up of Yakas' marriage, the failure of his business in Florida, and his relationship with Pamela Welty. On re-direct examination Yakas' counsel asked Sgt. Smith the following:
 
 
 54
 Q. Now, there has been some talk about Pamela Welty, Denny's [Yakas'] girlfriend for some period of time. You knew, didn't you--well, let me just ask you this: You said you knew Denny's wife.
 
 
 55
 A. Yes sir.
 
 
 56
 Q. Did you know that the two of them had been separated, at some point?
 
 
 57
 A. Yes sir.
 
 
 58
 Q. But you didn't know that he had a girlfriend in Florida?
 
 
 59
 A. No.
 
 
 60
 Q. I think Mr. Bahret [defendant's counsel] asked you something about opening up and letting one know what your feelings were all about.
 
 
 61
 Did Denny ever possess that trait prior to the incident?
 
 
 62
 A. No.
 
 
 63
 Q. What about after the incident?
 
 
 64
 A. More so, yes, now he will start talking about different things, but more so than then, much more so; then he just wouldn't do it.
 
 
 65
 Trial Record at 253-54. This testimony was entered directly before defendant's counsel began questioning Sgt. Smith on re-cross about what Smith knew about Yakas' break-up and what he knew about Yakas' relationship with Pamela Welty. We find that attempting to show that Sgt. Smith was not a reliable witness as to changes in Yakas' temperament by showing that he did not know the details about significant recent emotional events in Yakas' life was perfectly permissible. Further, showing that Yakas had a number of other reasons for being anxious, depressed and panicked would be directly relevant to damages--the reason that Yakas put Sgt. Smith on the stand in the first place. Therefore, we find no error in allowing the testimony.
 
 
 66
 Yakas also complains that defense counsel amplified the prejudice of counsel's first reference to alleged violent episodes between Yakas and Pamela Welty when counsel mentioned the violence again in closing argument. Specifically, counsel for K-Mart said:
 
 
 67
 Speaking of other things, unfair comments, I asked Sgt. Smith--this is out of the ordinary, in terms of argument, I thought--and I asked Sgt. Smith if there was any violence between Mr. Yakas and the cocktail waitress, Pamela Welty. Now, counsel says you won't find it anywhere in these medical records, but he knows where you will find a reference to that, he knows that it is in the record of the case, in the discovery.
 
 
 68
 J.App. at 55.[4] However, in Yakas' closing argument, which took place before the defendant's, the following exchange took place.
 
 
 69
 Mr. Licata: Do you remember the last question Mr. Bahret [defendant's counsel] asked Sgt. Smith. He said, "Are you aware of any incident of violence involving Pamela Welty?" And I objected. I objected because I couldn't believe the question--when did you stop beating your wife.
 
 
 70
 Mr. Bahret: Are we permitted to talk about evidence stricken from the record?
 
 
 71
 Mr. Licata: That wasn't stricken.
 
 
 72
 Mr. Bahret: I think the jury will be instructed not to consider questions not answered.
 
 
 73
 Trial Record at 305. Thus, it was Yakas himself who again made reference to this testimony in his closing giving rise to the defendant's response quoted above.
 
 
 74
 After Mr. Bahret's comment in his closing, the court stated: "The jury knows what the evidence is. Let's stop this, it is just lawyer talk, and the jury knows that, and I will tell them more about it later." Trial Record at 318. We have reviewed the entire charge and did not find any other reference to this testimony. However, as we have found above, while the defendant's line of questioning might have been tactless, it was clearly relevant and the door had been opened by Yakas through his questioning of Sgt. Smith. Further, as regards the closing statements, we find that any prejudice argument Yakas might have had went out the window when he made explicit reference to the testimony himself in his closing. In addition, from the quoted transcript above, it would seem that it was defendant that reminded the jury not to consider the evidence after Yakas' lawyer had brought it up. We therefore find no error as regards the defense counsel's closing statement.
 
 V.
 
 75
 Yakas' last contention is that the trial court erred in not granting him a new trial based upon the errors alleged or alternatively because he claims the verdict was against the substantial weight of the evidence. In a diversity case, whether a new trial motion should be granted is a question of federal law. Toth v. Yoder Co., 749 F.2d 1190, 1197 (6th Cir.1984). This court has held that whether to grant or deny a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." Moran v. Johns-Manville Sales Corp., 691 F.2d 811, 816 (6th Cir.1982).
 
 
 76
 As described above, we have found that none of Yakas' claims of error, either individually or considered together, require a new trial. Therefore, we find that it was in the district court's proper discretion to deny the new trial motion based upon Yakas' alleged errors at trial.
 
 
 77
 Yakas also contends that he was entitled to a new trial because the jury verdict was against the weight of the evidence. When a district court is considering such a motion, it must compare opposing proofs and weigh the evidence and must grant a new trial if it finds that the verdict is against the weight of the evidence. TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir.1981). However, courts may not reweigh the evidence for the jury and set aside a verdict simply because the judge feels other results are more reasonable. Id.
 
 
 78
 In his opinion denying Yakas' motion for new trial the court addressed the weight of the evidence as follows:
 
 
 79
 [T]he only evidence presented that Mr. Yakas actually hit his head on the trailer display was his own testimony. While it was uncontroverted that Mr. Yakas was hospitalized the day after the alleged accident, he was diagnosed as having suffered a concussion and post-concussion syndrome purely on subjective findings. As such, because his credibility was peculiarly a matter for the jury to assess ..., this court is convinced that the jury's failure to find Mr. Yakas sustained any damages was not against the manifest weight of the evidence.
 
 
 80
 J.App. at 42 (emphasis original). Given that our standard of review here is highly deferential to the trial court's discretion, we do not find any basis to quarrel with the court's decision based upon Yakas' credibility and the lack of evidence on causation of his injuries. Further, Ohio law does not required that fault be found in every case. As the Ohio Supreme Court put it:
 
 
 81
 Not every accident that occurs gives rise to a cause of action upon which the party injured may recover damages from some one. Thousands of accidents occur every day for which no one is liable in damages, and often no one is to blame, not even the ones who are injured.
 
 
 82
 Kresge Co. v. Fader, 116 Ohio St. 718, 724 (1927).
 
 VI.
 
 83
 For the foregoing reasons, the decision of the district court is hereby AFFIRMED.
 
 
 
 *
 The Honorable James D. Todd, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Yakas relies on two cases to support his view that the photos should have been admitted. In Woods v. Burlington Northern R. Co., 768 F.2d 1287 (11th Cir.1985), rev'd on other grounds, 480 U.S. 1 (1987), the photos sought to be admitted by the personal injury plaintiffs were photos of the actual accident area showing the streets involved, the degree of deterioration in those streets and were highly relevant to the case. Id. at 1291. In Bognar v. Zayre Corp, 702 F.Supp. 151 (N.D.Ohio 1988), the defendants sought to reverse a jury verdict based upon the admission of a photo of a table which had allegedly injured the plaintiff. Defendants contended that the plaintiff had not shown that the table depicted was the one that had fallen on the plaintiff. The court found that the admission was not reversible error because neither plaintiff nor defendant were sure which table had injured the plaintiff and the photos were the ones provided to the plaintiff by the defendant in discovery. Id. at 153. Both of these cases are distinguishable from the instant case because the photos sought to be admitted by Yakas were not photos of the actual accident scene and there was no showing that Yakas could not have photographed the actual accident site, had he attempted to do so
 
 
 [2]
 The parties did not include these pages in the Joint Appendix. However, because we have had problems with the party's citations to the Joint Appendix which are insufficient for resolution of the issues presented on appeal, we will cite to the original trial transcript as well. Citations to portions of the trial transcript not included in the joint Appendix will be referenced as "Trial Record."
 
 
 [3]
 Yakas claims that he entered an objection here but no record appears on the transcript. As the defendant does not contest that an objection was entered, we will assume it was in fact made
 
 
 [4]
 Defendant alleges that there was a reference to violence between Yakas and Welty in one of the records provided during discovery. However, this record was not admitted into evidence and we will not validate this statement by counsel based upon evidence which was not before the jury