**CITY OF CLEVELAND, Plaintiff,**

v.

**The CLEVELAND ELECTRIC ILLUMI-NATING COMPANY, Defendant.**

**Civ. A. No. C75–560.**

United States District Court,
N. D. Ohio, E. D.

Aug. 7, 1980.

Opinion on Voir Dire Examination
Aug. 7, 1980.

Opinion on Motion to Exclude From Venire
Sept. 4, 1980.

Opinion on Motion for Change of Venue
Feb. 4, 1981.

Opinion on Subsequent Motion to Exclude
From Venire June 18, 1981.

---

William B. Norris, Hahn, Loeser, Freedheim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law, City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

Presently before the Court is what is styled the Plaintiff's "Motion for Jury Instruction on Voir Dire and at Close of Evidence", whereby the City petitions the Court to instruct the jury, in effect, that any money judgment rendered against the defendant, The Cleveland Electric Illumi-

nating Company ("CEI"), will be borne exclusively by the company and its shareholders and thus will not subsequently manifest itself in the form of higher utility rates for the defendant's retail customers. Plaintiff urges that such an instruction is necessary to eliminate any possibility that a member of the jury panel, which may ultimately be comprised in substantial part of CEI retail customers, may be improperly influenced by a personal financial interest in the outcome of this litigation. To facilitate the impaneling of a fair and impartial jury, the City thus petitions the Court to instruct the jury, in substance, as follows:

> You are advised that should you render a judgment in favor of the City of Cleveland and against the Defendant, The Cleveland Electric Illuminating Company, the payment thereof will be by CEI and the burden thereof will be borne exclusively by CEI and its shareholders, and will not be paid by its customers. In other words, the amount of any judgment against the Defendant, The Cleveland Electric Illuminating Company, will not be included in its rates for the sale of electric power to its customers and will not cause its billings to be increased to its customers.

In opposing the instant motion, defendant argues with considerable force that there is no assurance that the substance of the proposed instruction is correct as a matter of law. CEI asserts in this regard that the extent to which a given expenditure of the defendant is properly considered either a legitimate operating expense or, alternatively, a constituent element of CEI's rate base, so as to be reflected in the utility's allowable retail rates, is a matter committed to the sole discretion of the Public Utilities Commission of Ohio ("PUCO"), subject

only to review by the Ohio Supreme Court. *See* O.R.C. §§ 4909.01 *et seq.* Defendant further submits that it defies economic realities to even postulate that an adverse judgment of the magnitude contemplated herein, that is, in excess of $300,000,000, may be sustained by CEI without some appreciable impact, direct or indirect, upon the utility's subsequent rate structure.

Plaintiff nonetheless insists that the amount of any money judgment rendered in the instant action will necessarily be excluded from consideration in future state rate making proceedings. In support of this broad assertion, the City argues that existing legal precedent forecloses a regulated utility from recouping past losses by the imposition of higher service rates, *see Knoxville v. Knoxville Water Co.*, 212 U.S. 1, 15, 29 S.Ct. 148, 152, 53 L.Ed. 371 (1908); *Galveston Electric Co. v. Galveston*, 258 U.S. 388, 395, 42 S.Ct. 351, 354, 66 L.Ed. 678 (1921), and similarly precludes a regulatory commission from allowing as a current operating expense nonrecurring expenditures.[1] The plaintiff further maintains that losses resulting from a utility's illegal or unlawful conduct, in this instance, violations of the antitrust laws, are not legitimate expenses for rate making purposes. Such a contention is premised upon the United States Supreme Court's opinion in *NAACP v. Federal Power Commission*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), wherein the Court, in assessing the statutory powers and responsibilities of the Federal Power Commission, stated as follows:

> The Commission clearly has the duty to prevent its regulatees from charging rates based upon illegal, duplicative, or unnecessary labor costs. To the extent that such costs are demonstrably the

---

1. For this latter proposition, the City relies upon the Ohio Supreme Court's decision in *City of Cincinnati v. Public Utilities Commission*, 161 Ohio St. 395, 119 N.E.2d 619 (1954). This reliance, however, would appear somewhat misplaced, as the foregoing precedent expressly recognizes the "universal rule" that nonrecurring expenses need not be entirely disallowed by a regulatory body but may instead, in appropriate instances, be "amortized over a

reasonable period" of time. *Id.* 119 N.E.2d at 623. Accordingly, even in the event the PUCO would subsequently resolve that an antitrust money judgment is in the nature of a nonrecurring expense, prevailing precedent would appear to authorize the Commission to afford consideration to such a judgment, albeit on an amortized basis, in ascertaining the appropriate electric rates of the defendant.

product of a regulatee's discriminatory employment practices, the Commission should disallow them. For example, when a company complies with a backpay award resulting from a finding of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., it pays twice for work that was performed only once. The amount of the backpay award, therefore, can and should be disallowed as an unnecessary cost in a ratemaking proceeding.

To the extent that these and other similar costs, such as attorneys' fees, can be or have been demonstrably quantified by judicial decree or the final action of an administrative agency charged with consideration of such matters, the Commission clearly should treat these costs as it treats any other illegal, unnecessary, or duplicative costs. We were told by counsel during oral argument that the Commission would routinely disallow the costs of a backpay award resulting from an order of the National Labor Relations Board or the decree of a court based upon a finding of an unfair labor practice. The governing principle is no different in the area of discriminatory employment practices.

*Id.* at 668, 96 S.Ct. at 1810–1811. In urging this tribunal to find the rationale of *NAACP v. Federal Power Commission* controlling, the City argues that in the event "public utilities were permitted to recoup antitrust judgments through the rate making process, they would be immunized from the economic consequences of violation of the antitrust laws". Memorandum in Support of Motion, at p. 6.

2. The Johnson Act provides:
The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:
(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
(2) The order does not interfere with interstate commerce; and

In assessing the plaintiff's aforestated contentions, the Court must observe at the outset that these arguments are more properly addressed to the appropriate forum, the PUCO. It is clearly not the province of this Court to adjudicate the complex regulatory issues which may ultimately arise upon the entering of a money judgment in the instant litigation. These determinations are purely matters of local concern, entrusted to the specialized expertise of the PUCO, subject to limited review by the appropriate appellate courts. This tribunal, in addition to lacking any special competence in the area of rate regulation, would appear, more fundamentally, to lack the underlying judicial authority necessary to direct compliance with any rate-related determination the Court might ill-advisedly decree. Indeed, the provisions of the Johnson Act [2], 28 U.S.C. § 1342, expressly prohibit, in the absence of special circumstances, federal court interference with the states' administration of their public utility rates. *See Tennyson v. Gas Service Co.*, 506 F.2d 1135 (10th Cir. 1974); *Bridgeport Hydraulic Co. v. Council on Water Co., etc.*, 453 F.Supp. 942, 953–54 (D.Conn.1977), *aff'd.*, 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978); · *Kalinsky v. Long Island Lighting Co.*, 484 F.Supp. 176 (E.D.N.Y.1980); *South Central Bell Telephone Co. v. Public Service Commission of Kentucky*, 420 F.Supp. 376 (E.D.Ky.1976).

In view of the Johnson Act prohibition against federal intrusion upon the states' regulation of public utility rates, it is highly questionable whether this Court possesses jurisdiction to enforce any determination it might reach regarding the propriety of including, for ratemaking purposes, the amount of any ensuing antitrust judgment.[3]

(3) The order has been made after reasonable notice and hearing; and,
(4) A plain, speedy and efficient remedy may be had in the courts of such State.

3. Moreover, even in the event the Johnson Act proscription was found inapplicable, considerations of comity, and the desirability of deferring to the administrative expertise of the state regulatory body, would lend substantial support for the conclusion that the Court should decline to exercise any jurisdiction which may exist in

In addition to the Court's apparent inability to control the resolution of those issues which appear likely to be joined before the PUCO in the aftermath of a substantial damage award herein, the Court, in view of the present state of the law, can only speculate as to the disposition the state regulatory process might ultimately find most consistent with Ohio's regulatory objectives. The Court is, for example, directed to no legal precedent, and its research fails to disclose any legal authority, emanating from Ohio or elsewhere, which specifically addresses itself to the proper regulatory treatment afforded adverse antitrust judgments. Although the City conjectures that the Ohio regulatory process will elect to follow and apply the aforementioned rationale of *NAACP v. Federal Power Commission, supra,* and thus disallow the amount of any money judgment as a loss resulting from unlawful conduct, the Court's review of the applicable authorities discloses little, if any, underlying support for the plaintiff's speculation. The Court, for instance, is unaware of any legal authority which holds or otherwise intimates that the principles of *NAACP v. Federal Power Commission* necessarily obtain in the context of state, as opposed to federal, rate regulation.[4] The case authorities leave similarly unresolved the applicability of the aforesaid precedent to the realm of antitrust damage awards. *Cf. City of Columbus v. Public Utilities Commission,* 154 Ohio St. 107, 93 N.E.2d 693, 706–707 (allowing as operating expense fees expended to secure indemnity from patent infringement claims). Lastly, and perhaps most importantly, it is highly questionable whether the rationale of *NAACP v. Federal Power Commission,* will be subsequently extended in such a manner as to indiscriminately disallow, in their entirety, and irrespective of the economic consequences, damage awards

of the magnitude contemplated herein. The Court observes in this regard that established regulatory objectives include the preservation of the regulated entity's "financial integrity", so as to enable the utility to "attract capital, and to compensate its investors for the risks assumed". *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944). To accommodate these and other objectives, it is generally held that, in the absence of a specific statutory prohibition, a regulatory body is free to resort to "pragmatic adjustments which may be called for by particular circumstances." *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). *Accord: In Re Permian Basin Area Rate Cases,* 390 U.S. 747, 776–777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968). The foregoing principles are clearly reflected in the Ohio statutory scheme which, *inter alia,* expressly confers upon the PUCO the authority to temporarily alter or amend existing rates and schedules, for "such length of time as the commission prescribes", whenever, in the judgment of the PUCO, such remedial action is "necessary to prevent injury to the business ... of any public utility of this state". O.R.C. § 4909.16. *See City of Cambridge v. Public Utilities Commission,* 159 Ohio St. 88, 111 N.E.2d 1 (1953); *Manufacturers Light and Heat Co. v. Public Utilities Commission,* 163 Ohio St. 78, 125 N.E.2d 183 (1955); *Duff v. Public Utilities Commission,* 56 Ohio St.2d 367, 384 N.E.2d 264, 272–273 (1978).

In view of the instant circumstances, it cannot reasonably be stated, with any degree of certainty, that the Ohio regulatory process, if and when confronted with the issue, will in fact exclude for rate making purposes the entire amount of the very substantial money judgment which may be

a technical sense. *See Tennyson v. Gas Service Co., supra* at 1143.

4. The Supreme Court's opinion in *NAACP v. Federal Power Commission* in no way suggests that the regulatory principle favoring exclusion, for rate-making purposes, of losses stemming from unlawful conduct, is one of constitu-

tional dimension or is otherwise binding upon state regulatory bodies. Indeed, the Court's opinion expressly states that its determination is predicated solely upon its construction of the applicable federal statutory provisions. *Id.* 425 U.S. at 665 n.2, 96 S.Ct. at 1809.

rendered herein. In light of the Court's apparent lack of jurisdiction to interfere with or otherwise control the state rate-making process, and in view of the fact this tribunal, given the present state of the law, can only speculate as to the specific resolution the local regulatory process is likely to reach, the Court is constrained to conclude that the substance of the proposed instruction is not necessarily correct as a matter of law. In the absence of some assurance of the accuracy and legal propriety of the charge currently sought, the Court must decline the City's invitation to convey to the jury panel, as an established proposition of law, an instruction which subsequent state regulatory proceedings may well prove to be entirely erroneous. The Court must similarly dismiss the plaintiff's apparent request to advance the proposed instruction "[r]egardless of the correctness or incorrectness" thereof. Supplemental Memorandum in Support of Motion, at p. 4. The Court cannot and will not allow itself to become a party to an undertaking which may ultimately serve to misinform as well as mislead the jury panel.

██ The Court would observe in closing that the instant disposition is not intended to imply that this tribunal concurs with the City's contention that an instruction of the nature presently sought is in fact essential to the impaneling of a fair and impartial jury. The Court notes in this regard that, in the course of conducting voir dire examination, this tribunal regularly elicits from each of the prospective jurors an affirmation of the individual's willingness to render a verdict based solely upon the evidence adduced and the Court's instructions as to the applicable law. Moreover, it is the practice of this tribunal to inform the jury, both in the course of the Court's preliminary instructions, when given, as well as its final instructions, of the panel's solemn obligation to impartially consider the evidence presented, follow the law as instructed by the Court, and arrive at a fair and just verdict, irrespective of the consequences thereof. The Court is confident that these and other measures, including the conducting of a comprehensive voir dire examina-

tion, will prove sufficient to ensure the impaneling of a truly fair and impartial jury. The Court is unwilling to presume that any jury member will disregard both the repeated admonitions of the Court and the individual juror's own sworn declaration by somehow allowing the prospect of higher utility rates to unduly influence his deliberations in this case.

For the reasons hereinbefore stated, the Plaintiff's Motion for Jury Instruction on Voir Dire and at Close of Evidence is without merit and therefore denied.

IT IS SO ORDERED.

## ON VOIR DIRE EXAMINATION

Pursuant to this Court's pretrial Order of January 23, 1978, both parties have submitted for the Court's consideration various introductory statements, questions, and areas of inquiry which the respective litigants seek to have incorporated within this tribunal's voir dire examination of the prospective jury members. Each party has, in addition, responded in opposition to certain of its adversary's proposals.

In assessing the instant requests, the Court observes preliminarily that it is firmly established that the trial judge, in both civil and criminal proceedings, is afforded "considerable latitude with respect to the nature, scope and extent of voir dire examination." *Kuzniak v. Taylor Supply Co.*, 471 F.2d 702, 703 (6th Cir. 1972). *Accord: United States v. Johnson*, 584 F.2d 148, 155 (6th Cir. 1978); *James v. Continental Insurance Co.*, 424 F.2d 1064 (3d Cir. 1970); *United States v. Gibbons*, 607 F.2d 1320, 1330 (10th Cir. 1979); *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979), *cert. denied*, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 773 (1980); *United States v. Bowman*, 602 F.2d 160, 165 (8th Cir. 1979); *United States v. Delval*, 600 F.2d 1098, 1102 (5th Cir. 1979); *Labbee v. Roadway Express, Inc.*, 469 F.2d 169, 172 (8th Cir. 1972). The exercise of the trial court's broad discretion is, of course, subject to the essential demands of fairness. *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931).

It is equally well-established that the "essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel". *United States v. Anderson,* 562 F.2d 394, 398 (6th Cir. 1977). *Accord: United States v. Blount,* 479 F.2d 650, 651 (6th Cir. 1973). As observed by the Third Circuit Court of Appeals in *Kiernan v. Van Schaik,* 347 F.2d 775, 779 (3d Cir. 1965):

A jury's impartiality may not be assumed without inquiry, as in the case of a judge. Jurors are drawn from the general body of the community for a short term of service, usually lasting a few weeks, and then return to their customary occupations with neither training nor traditions of impartiality. They must often be unaware of their own disqualification in specific cases, especially since the standards for jury service differ in various parts of the country. Litigants therefore have the right, at the least, to some surface information regarding the prospective jurors. Such information may uncover ground for challenge for cause. If it does not, it will be available in the intelligent use of the peremptory challenge, which is the antithesis of challenge for cause. The traditional right of peremptory challenge recognizes that matters of bias or prejudice may be sensed or suspected without possibility of proof, and therefore permits counsel to exercise his inarticulate instinctive judgment, which he need not, if he could, attempt to justify.

Consistent with the overriding objective of the jury selection process, that being the impaneling of a truly fair and impartial jury, voir dire examination is not designed to extend to the litigants the "opportunity to obtain a jury sympathetic to their position." 9 Wright & Miller, Federal Practice and Procedure § 2482 at pp. 467–68 (1971). As succinctly stated by the Honorable Louis E. Goodman:

The only objective of jury interrogation is to obtain an impartial jury. No litigant is entitled to select a jury to his liking. He is only entitled to an impartial jury.

Goodman, The New Spirit in Federal Court Procedure, 7 F.R.D. 449, 451 (1947). Judge Nordbye has similarly observed that

no litigant is entitled to a jury of his liking. He is only entitled to an impartial jury. Many times in the examination of jurors, it is apparent that counsel, by the very nature of the questions asked, are not bent upon obtaining an impartial jury, but rather twelve men and women whom they believe will be more favorable to their side of litigation than to their adversaries. If the court's questions fairly cover the necessary examination of the jurors, counsel are apt to weaken their position before the jury by propounding duplicitous or frivolous questions.

Nordbye, Comments on Selected Provisions of the New Minnesota Rules, 36 Minn.L.R. 672, 681–82 (1952). *See also Rogers v. De Vries & Co.,* 236 F.Supp. 110, 112 (S.D.Tex. 1964).

The voir dire examination then, properly employed, encompasses interrogation designed to enable both the Court and counsel to detect the existence of bias and prejudice on the part of prospective jurors; it does not, by way of contrast, contemplate the entirely partisan use of juror questioning as a device utilized by the skillful practitioner to favorably predispose or otherwise incline the jurors to his client's side in the controversy. That is to say, a properly conducted voir dire examination aspires to identify bias and prejudice, not to implant it. To facilitate the impaneling of an impartial jury then, it is often incumbent upon the trial court to disallow "unnecessary and argumentative examination." *United States v. Anderson, supra,* 562 F.2d at 398. The applicable authorities further counsel that the trial court may also, in the exercise of its discretion, properly decline to permit juror inquiry which merely constitutes, in purpose and effect, a premature and self-serving attempt to instruct the veniremen on propositions of law. *See United States v. Crawford,* 444 F.2d 1404 (10th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *United States v. Le-*

*dee*, 549 F.2d 990 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977); *United States v. Wooton*, 518 F.2d 943 (3d Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); *United States v. Cosby*, 529 F.2d 143 (8th Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). *See also United States v. Anderson, supra,* 562 F.2d at 398.

■ In deference to the foregoing principles, the Court must decline to utilize either of the litigant's proposed introductory statements, neither of which appears entirely uninfluenced by the parties' respective interests in the outcome of this litigation. To ensure a wholly neutral and disinterested initial presentation to the prospective jurors, the Court will draft its own preliminary statement of the case, informing the veniremen, in a nonpartisan manner, of the nature of the action and the material issues joined therein.

In assessing the propriety of the specific questions and inquiries proposed by the litigants, the Court would, at the outset, and in recognition of the fact that the majority of the particular requests reflect proper subjects of juror interrogation, express to counsel its appreciation for their assistance in aiding this tribunal in its effort to ensure the parties the fair and impartial jury the instant controversy deserves. The parties should understand, however, that while the Court will endeavor to incorporate within its voir dire examination the substance of the essentially unopposed requests listed below, this tribunal, in accordance with the aforementioned principles, will not hesitate to reformulate the present language of any such proposed question where necessary to convey the substance of the inquiry in a neutral and detached manner. The litigants should further understand that the Court shall, in the exercise of its discretion, determine which of the numerous questions and inquiries are more appropriately directed to the jury panel collectively and which, if any, are more properly addressed to the prospective jurors separately and individually. Subject to these provisos, the Court finds the following requests meritorious and properly included within the voir dire examination:

(i) CEI's PROPOSED AREAS OF INQUIRY OF POTENTIAL JURORS, Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 15, 16, 17 and 18 [1]; and

(ii) SUGGESTED STATEMENTS AND QUESTIONS ON VOIR DIRE OF THE CITY OF CLEVELAND, Nos. A–5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 28, 31; and Nos. B–1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20 and 21.[2]

■ Plaintiff has objected to CEI's proposed inquiries nos. 12 and 13, which seek to ascertain whether the prospective jurors are aware of the defendant's prior efforts to obtain satisfaction of the monetary judgments previously rendered in the instant proceeding on CEI's counterclaims. CEI contends that an inquiry of this nature is necessary to specifically determine whether any potential juror has been unduly influenced by certain allegedly inflammatory statements of various City officials, who, in the past, publicly condemned the defendant's efforts to secure payment of the outstanding indebtedness. In opposing the defendant's requests, however, the City argues with some force that by advising the veniremen of the existence of the prior

1. Defendant's proposed inquiries nos. 6 through 11 will be revised to accommodate the City's objections thereto.

2. The portion of the City's proposed question no. A–12, which reflects the plaintiff's speculation as to the treatment the Ohio regulatory process will ultimately afford any money judgment rendered herein will, for the reasons stated in the Court's separate Memorandum and Order of this date, be deleted.

With regard to the City's proposed question no. A–31(b), inquiry relating to Alan P. Buchmann, Esq., shall be omitted unless said individual actively participates in the trial of this case.

Finally, the Court is cognizant of the current inconsistency between plaintiff's proposed questions no. A–5 and B–20 and, accordingly, will undertake to eliminate the same in the course of inquiring as to the veniremen's ability and willingness to serve for the duration of the impending protracted trial.

judgments, as well as the plaintiff's reluctance to satisfy the same, the proposed inquiries create the highly prejudicial inference that "the City of Cleveland is the 'bad guy', guilty of some [unspecified] wrongdoing and unable or unwilling to pay its bills." Objections on Behalf of the City of Cleveland to CEI's Proposed Areas of Inquiry of Potential Jurors, at p. 5.

The Court finds the City's aforestated objection well-taken. It is abundantly clear, as the plaintiff contends, that the inquiries in question permit the prejudicial inference that the City has previously been adjudged guilty of some unidentified wrongdoing which has warranted the entering of an adverse money judgment by the very tribunal which is to preside over the trial of the instant antitrust claims. Moreover, it is highly questionable whether the proposed references to the foregoing monetary judgments and the collection efforts attendant thereto are in fact necessary to identify and detect the particular bias the defendant apparently fears. Indeed, the Court is presently of the opinion that any prejudice or bias occasioned by a prospective juror's exposure to, and recollection of, the aforementioned inflammatory public statements may be readily discerned by the use of entirely neutral inquiries designed to probe, in a somewhat more general but nonetheless thorough manner, the precise effects of pretrial publicity. *See e.g.* CEI's Proposed Areas of Inquiry of Potential Jurors, nos. 10, 15, and 16; Suggested Statements and Questions on Voir Dire of the City of Cleveland, nos. A–14, 16, 17, 18 and 19. Accordingly, plaintiff's objection to CEI's proposed inquiries nos. 12 and 13 is hereby sustained.

■ CEI has responded in opposition to the City's proposed questions nos. A–24, 25, 26 and 27, whereby the plaintiff urges the Court to specifically inquire of the veniremen's ability to follow and accept certain jury instructions which, if given, would inform the panel, *inter alia*, that: (i) "CEI is subject to the antitrust laws even though it is also subject to State and Federal regulation"; (ii) "competitors must compete within certain limits set by law"; (iii) "in some circumstances a firm must deal with a competitor on the same terms that it deals with noncompeting firms"; and (iv) "a competitor which controls a facility which cannot be practicably duplicated . . . must permit it's competitor access to that facility". In passing on the instant requests, the Court observes that the questions at bar are quite clearly comprised of legal propositions which would appear to reflect in significant part the plaintiff's theory of the case. This Court has previously indicated that voir dire examination does not properly extend to juror inquiry which merely constitutes, in both purpose and effect, a premature and entirely self-serving attempt to instruct the veniremen on potentially beneficial propositions of law. The Court has also heretofore acknowledged the trial judge's obligation to protect prospective jurors from unnecessary and argumentative examination. These established principles are dispositive of the requests in issue, and compel the conclusion that the defendant's objections to the City's proposed questions nos. A–24, 25, 26 and 27 are properly sustained.

■ Plaintiff's proposed question no. A–29, which seeks to ascertain whether any prospective juror may be influenced, either favorably or adversely, by reason of the fact that the Cleveland Municipal Electric System (hereinafter "Muny Light") is ultimately managed by an elected official and his appointees, represents a perfectly appropriate voir dire inquiry. By way of contrast, CEI's proposed counterpart to A–29, whereby the defendant aspires to prematurely interject its contention that the financial difficulties encountered by Muny Light are attributable to mismanagement and neglect, is highly argumentative and therefore without merit.

The remaining request in issue is the City's proposed question no. A–30, which proffers the following inquiry:

> You are each to be aware of the fact that the City of Cleveland is seeking a judgment of millions of dollars from CEI. If the evidence supports the judgment sought by the City of Cleveland, would

you have any hesitancy in awarding a judgment of millions of dollars for the City and against CEI?

■ A review of the applicable authorities discloses that the trial court may, in the exercise of its discretion, permit juror interrogation designed to identify pre-existing bias or prejudice against large damage awards which may not readily yield to the evidence presented. *Geehan v. Monahan,* 382 F.2d 111, 115 (7th Cir. 1967); *Murphy v. Lindahl,* 24 Ill.App.2d 461, 165 N.E.2d 340 (1960); *Jines v. Greyhound Corp.,* 46 Ill. App.2d 364, 197 N.E.2d 58, 59 (1964); *Bunda v. Hardwick,* 376 Mich. 640, 138 N.W.2d 305 (1965); *Dehn v. Otter Tail Power Co.,* 251 N.W.2d 404 (N.D.1977). It is imperative, however, that any such inquiry be framed in a general and entirely nonsuggestive manner, so as to eliminate any possibility that the question will serve to commit or pledge any member of the jury panel to a specific verdict amount. *See Annotation: Propriety of Inquiry on Voir Dire as to Juror's Attitude Toward Amount of Damages Asked,* 82 A.L.R.2d 1420; *Wright v. Chicago, Burlington & Quincy Railroad Co.,* 392 S.W.2d 401 (Mo.1965); *Morgan v. Liberty Mutual Insurance Co.,* 323 So.2d 855 (La.App.1975); *Dehn v. Otter Tail Power Co., supra. See also Trautman v. New Rockford-Fessenden Cooperative Transport Assn.,* 181 N.W.2d 754 (N.D.1970).

■ In accordance with the prevailing weight of authority, the Court will accede to the City's request to make inquiry of the prospective jurors' attitudes and opinions regarding the rendering of substantial damage awards. The Court, as always, reserves the right to dictate the precise language in which the substance of proposed question no. A–30 will ultimately be conveyed to the jury panel.

IT IS SO ORDERED.

### ON MOTION TO EXCLUDE FROM VENIRE

Presently before the Court is the plaintiff's motion of August 15, 1980, urging the Court to exclude from the venire all individuals who are electric power customers of either the City or the Cleveland Electric Illuminating Company. Plaintiff contends that this broad exclusion of prospective jurors is necessary to ensure the jury panel's impartiality, predicating this assertion upon the rather conclusory and entirely unsubstantiated allegation that "customers of the City would probably believe that they would gain a benefit from a large verdict in favor of the City, while the customers of the Cleveland Electric Illuminating Company would probably believe they would suffer a detriment by a large verdict against CEI". Defendant, by memorandum of August 20, 1980, has responded in opposition to the proposed disqualification, arguing with considerable force that the City's "suggestion that customers of either party would be so certainly biased that they should be automatically excluded from the panel without further inquiry is sheer speculation."

■ A review of the applicable authorities discloses that the trial court is vested with broad discretion in determining the sufficiency of challenges to prospective jurors. *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950); *Cox v. General Electric Co.,* 302 F.2d 389, 391 (6th Cir. 1962); *United States v. Ploof,* 464 F.2d 116, 118 n.4 (2d Cir. 1972); *Neveaux v. Central Gulf Steamship Corp.,* 503 F.2d 961 (5th Cir. 1974); *United States v. Mason,* 440 F.2d 1293, 1298 (10th Cir.), *cert. denied, Edwards v. United States,* 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 934 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Gullion,* 575 F.2d 26, 29 (1st Cir. 1978); *United States v. Brown,* 540 F.2d 364, 379 (8th Cir. 1976); *United States v. LePera,* 443 F.2d 810, 812 (9th Cir.), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *United States v. Taylor,* 554 F.2d 200, 202 (5th Cir. 1977). Existing legal precedent further counsels that a litigant advancing a challenge for cause bears the burden of persuading the trial court of the prospective juror's lack of impartiality. *Irvin v. Dowd,* 366 U.S. 717,

723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979); *United States v. Ceja*, 451 F.2d 399, 401 (1st Cir. 1971); 9 Wright & Miller, Federal Practice and Procedure § 2483 at 472 (1971). In order to sustain this burden, it is generally incumbent upon the challenger to "raise a contention of bias from the realm of speculation to the realm of fact." *Dennis v. United States, supra. Accord: Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1971). *See also Goins v. McKeen*, 605 F.2d 947, 951 (6th Cir. 1979).

■ In the instant controversy, the City has clearly failed to discharge its burden of demonstrating the propriety of, and the necessity for, the wholesale disqualification of veniremen which is currently sought. Indeed, the record, as presently comprised, is entirely devoid of any competent proof which would lend the slightest factual support to the plaintiff's contention that the total and indiscriminate exclusion of both CEI and City of Cleveland electric power customers is essential to the impaneling of a fair and impartial jury. The plaintiff's current motion is predicated entirely upon the wholly unsubstantiated allegation that City customers "probably" believe their pecuniary interests would be served by a substantial damage award herein while, conversely, customers of CEI "probably" believe that such a money judgment would impact adversely upon their individual financial interests. Such conjecture is, without more, clearly insufficient under the foregoing authorities to rebut the "presumption of impartiality" enjoyed by prospective jurors. *See Irvin v. Dowd, supra*, 366 U.S. at 723, 81 S.Ct. at 1642–43; *United States v. Morlang*, 531 F.2d 183, 187 (4th Cir. 1975). Moreover, to give legal effect to the plaintiff's current speculation might appear, in view of the absence of any showing of disqualifying bias, and in light of the defendant's strenuous objection to the instant motion, to contravene the principles embodied in 28 U.S.C. § 1861, which states in material part:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

*See Royal Indemnity Co. v. City of Erie*, 372 F.Supp. 1137, 1140 (W.D.Pa.1974).

The insufficiency of the City's current request is further demonstrated by a review of those case authorities which have been confronted with circumstances analogous to those presented herein. In *Virginia Electric and Power Co. v. Sun Shipbuilding and Dry Dock Co.*, 389 F.Supp. 568 (E.D.Va. 1975), for example, the Virginia Electric and Power Company (VEPCO) had instituted a breach of contract action against Sun, a Pennsylvania manufacturer, seeking damages in excess of $150,000,000. In view of the fact that the judicial division in which the suit was initiated was serviced exclusively by plaintiff VEPCO or electric power systems which purchased wholesale from VEPCO, the defendant petitioned the district court for a transfer of the action, maintaining, *inter alia*, that "[t]he vast majority of potential jurors in the Eastern District of Virginia will have a substantial and conscious pecuniary interest in the outcome of this lawsuit, since the rates which VEPCO will be able to charge will be measurably reduced if it recovers in this action amounts in the magnitude of the damages claimed." *Id.* at 569.

In assessing the sufficiency of the defendant's contentions, the court observed that the proper treatment to be afforded any VEPCO recovery was a matter entrusted to the sole discretion of the appropriate state regulatory commission, such that the litigants could at that juncture only speculate as to whether any ensuing damage award would in fact inure to the benefit of the prospective jurors by occasioning either a reduction in rates or a rebate to VEPCO customers. Since the potential financial interest of the challenged veniremen was entirely contingent upon a future determination of the state regulatory body, the dis-

trict court concluded that the pecuniary interest in question was too remote and speculative to warrant, without further inquiry, the wholesale disqualification of all VEPCO customers. The Court accordingly denied Sun's motion to transfer the cause to a Pennsylvania forum.

The VEPCO litigation gave rise to further related proceedings before the Fourth Circuit Court of Appeals in *In re Virginia Electric and Power Co.*, 539 F.2d 357 (4th Cir. 1976), wherein the appellate court was called upon to review the propriety of the district judge's decision to recuse himself from the aforesaid controversy, which determination was predicated solely upon the trial judge's status as a VEPCO customer. The Fourth Circuit described the trial court's financial interest in the litigation thusly:

> An audit of the district judge's utility bills by a professional accounting firm revealed that *if* VEPCO wins the lawsuit, and *if* it is awarded the entire amount claimed, and *if* the defendants satisfy the judgment, and *if* the Virginia State Corporation Commission decides that VEPCO must return to its customers that part of the award representing increased fuel costs, and when VEPCO makes such an adjustment, then the trial judge, as a customer of VEPCO, would get a refund estimated at between $70 and $100.

*Id.* at 360 (footnote omitted). The appellate court, following an exhaustive review of the authorities, concluded that an interest of this nature was entirely insufficient to justify disqualification and, indeed, characterized the district judge's finding to the contrary as "clearly erroneous", stating in part:

> We are inclined to agree with the district court that $70 to $100 cash in hand is not *de minimis*. But when the possibility of recovering that amount is spread over the next 40 years, is dependent upon VEPCO winning the lawsuit and the full amount claimed, collecting the judgment, and the Virginia State Corporation Commission requiring VEPCO to return increased fuel costs to its customers, we doubt that

> anyone other than Jimmy the Greek would offer anything for the judge's chance. A reasonable man would doubtless prefer a $2 ticket at Churchill Downs on the first Saturday in May. We hold the judge's "any other interest" in VEPCO's speculative recovery was *de minimis* and his finding to the contrary clearly erroneous.

*Id.* at 368.

A similar result obtained in the case of *Pennsylvania Power & Light Co. v. Gulf Oil Co.*, 270 Pa.Super. 514, 411 A.2d 1203 (1979), wherein the Superior Court of Pennsylvania upheld a lower court determination denying the motion of defendant General Atomic Company (GAC) for a change of venue. In that action, Pennsylvania Power and Light (PP&L) had instituted suit against several defendants, alleging breach of contract and seeking damages of between $229,000,000 and $275,000,000. In moving the trial court for a change of venue, defendant GAC asserted that the vast majority of the prospective jurors were customers of PP&L, and, as such, possessed an interest in the controversy adverse to the defendants. In support of these allegations, GAC, unlike the City herein, adduced evidence tending to demonstrate that as many as 98.5% of the inhabitants of the forum county were PP&L customers and, moreover, that each such customer stood to receive possible monetary benefits of up to $289.86 in the event PP&L was awarded the full amount of its damage prayer and, in addition, the Pennsylvania Public Utilities Commission (PUC) subsequently resolved that the amount of such a money judgment was properly distributed to the utility's customers by way of either reduced rates or reimbursements. The defendant presented, moreover, certain expert testimony opining that a jury panel's awareness of the possibility of the aforementioned financial benefit would suffice to color the panel's perception of the evidence and prejudice them against GAC.

In a comprehensive and well-reasoned opinion, the Pennsylvania Superior Court agreed that GAC's showing was insufficient

to warrant the requested change of venue. In accordance with the rationale of the district court in *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co., supra,* the state appellate court found the prospective jurors' pecuniary interest in the controversy remote and speculative, explaining in part:

> Fundamental to the notion of interest as argued by GAC is the assumption that PP&L will pass any recovery back through to its customers either by reimbursement or reduced electric rates. This assumption is questionable, for its correctness depends upon a future decision by a third party, the PUC, which decision no one can predict with any certainty. Thus there can be no present benefit to PP&L customers but only the possibility of a future benefit. As such a customers' interest is speculative.

*Pennsylvania Power & Light Co., supra* 411 A.2d at 1214. Of similar relevance herein, the Superior Court refused, in the absence of more specific, particularized findings, to presume a disqualifying lack of impartiality on the part of the veniremen in question, intimating instead that a proper assessment of GAC's allegations of partiality would be more appropriately undertaken during the course of the trial court's voir dire examination.

> One other assumption critical to GAC's argument is that the Lehigh County veniremen believe, or, when the jury would be selected, would believe, that they will benefit from a recovery of damages by PP&L. GAC has offered no evidence that would support a finding of such a belief, as, for example, any newspaper reports or other types of publicity indicating that a recovery by PP&L would benefit its Lehigh County customers. *See Long Island Light Co. v. New England Petroleum Corp.,* 80 Misc.2d 183, 362 N.Y. S.2d 350 (1974) (newspapers reported that recovery by utility would result in rebate to utility's customers). Moreover, we do not find it realistic to assume that every public utility customer automatically assumes that a recovery by a utility in a

civil suit will inure to the benefit of the utility customers.

\* \* \* \* \* \*

> While it is true that a violation of due process may be found where the tribunal has a pecuniary interest in the outcome of the case such that unfairness by the tribunal can be assumed, *see Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), we will not assume unfairness, and therefore will not find a violation of due process, where the only interest shown is a speculative and perhaps insignificant possibility of some future benefit. As to GAC's concern that some of the PP&L customers believe that they will benefit, this belief, if indeed it does exist, is something that we believe can be satisfactorily discovered on voir dire.

*Pennsylvania Power & Light Co., supra* at 1215–1216, 1218 (footnotes omitted).

In the within action, this Court fully intends to conduct a comprehensive voir dire examination, a significant portion of which shall be designed to ascertain whether the veniremen have, or believe they have, a financial interest in the outcome of this controversy. Should it become apparent during the voir dire examination that a prospective juror's pecuniary or other interest in the litigation, real or perceived, will preclude said individual from serving in an entirely fair and impartial manner, the Court will not hesitate to excuse the juror in question. However, the plaintiff's current attempt to indiscriminately exclude from the venire all City and CEI electric power customers, which attempt is unaccompanied by the slightest effort to raise the instant contention of bias "from the realm of speculation to the realm of fact", *Dennis v. United States, supra,* finds no support from the governing authorities and appears, in addition, entirely inconsistent with the policy embodied in 28 U.S.C. § 1861. The conclusion is thus compelled that the motion at bar is without merit and properly denied.

For the reasons hereinbefore stated, the plaintiff's motion of August 15, 1980, seeking to exclude from the venire all individu-

als who are electric power customers of either the City or CEI, is hereby denied.

IT IS SO ORDERED.

## ON MOTION FOR CHANGE OF VENUE

 Presently before the Court is the motion of the defendant The Cleveland Electric Illuminating Company (CEI) for a change of venue pursuant to 28 U.S.C. § 1404(a). Plaintiff City of Cleveland, by memorandum of January 2, 1981, has responded in opposition.

The record discloses that the defendant's motion is primarily predicated upon the extensive publicity which attended the first trial of this action, which proceeding culminated in the declaration of a mistrial when the jury was unable to arrive at a unanimous verdict. CEI maintains that the publicity accompanying the first trial and its aftermath is of such dimension and nature as to preclude the impaneling of a fair and impartial jury in this judicial district. In support of its contention that the scheduled retrial of this cause must proceed in an alternate forum, CEI has submitted for the Court's perusal a voluminous compendium of news articles and transcripts of area television and radio broadcasts. These exhibits consist of, *inter alia*, daily descriptions of the proceedings of the first trial, post-trial accounts of certain of the jury members' respective assessments of the merits of the case, editorial commentary urging that the City pursue a retrial of the cause, and newspaper opinion polls reflecting, to varying degrees, community support for the City's position in this litigation. The defendant contends that the submitted items demonstrate that the publicity here in question has not only been "pervasive" in scope but also "inflammatory" and "generally anti-CEI" in character. Defendant's Brief in Support of Motion, at pp. 1, 14.

In opposing the proposed change of venue, however, the plaintiff takes issue with the foregoing assessment, and insists in fact that CEI "has strained to infer the existence of widespread prejudice against it". Plaintiff's Brief in Opposition to Motion, at p. 1. The City further opines that the publicity occasioned by the first trial and its aftermath has "primarily consisted of objective and factual media coverage". *Id.* at p. 3. The plaintiff asserts, moreover, that the question of whether the instant pretrial publicity is of such a character as to preclude the impaneling of a fair and impartial jury in this forum is one whose resolution should await *voir dire* examination at the retrial of this cause.

Considerable authority does indeed counsel that, in the absence of extraordinary circumstances, "the proper manner for ascertaining whether the adverse publicity may have biased the prospective jurors [is] through the voir dire examination." *United States v. Jones,* 542 F.2d 186, 193 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Thus, it has been held that it is "entirely within the court's discretion to defer ruling on a motion for change of venue based upon prejudice of the community until it can test that charge by examining the panel drawn to hear the case." *United States v. Brown,* 540 F.2d 364, 377–78 (8th Cir. 1976). *Accord: United States v. Gullion,* 575 F.2d 26, 28 (1st Cir. 1978). As stated by the Sixth Circuit Court of Appeals in *United States v. Johnson,* 584 F.2d 148, 154 (6th Cir. 1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979):

> The merit of a change of venue motion is most likely to be revealed at voir dire of the potential jurors. Through proper questioning the court can determine the extent of the veniremen's exposure to the publicity and the effect it has had upon them.

*Accord: United States v. Caesar,* 368 F.Supp. 328, 335 (E.D.Wis.1973), *aff'd sub. nom., United States v. Harden,* 519 F.2d 1405 (7th Cir. 1975); *United States v. Mandel,* 431 F.Supp. 90, 100 (D.Md.1977). *See* 1 Wright, Federal Practice and Procedure § 342 at 627 (1969).

Applying the foregoing principles, the Court, having carefully reviewed the record, is persuaded that a ruling upon the defendant's pre-*voir dire* motion would at this early juncture be improvident and pre-

mature. To hold otherwise would require that this tribunal predicate its determination upon the Court's own subjective appraisal of the nature and extent of the instant exposure, and the impact thereof. As observed by the Court of Appeals in *United States v. Haldeman*, 559 F.2d 31, 62 n. 37 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977):

> A judge reviewing pretrial publicity before the *voir dire* would have to attempt to determine from his own reactions how the community would respond to that publicity. The subjective nature of this determination is well illustrated by the arguments in the briefs. The Government maintains that since "[t]he offenses charged here were not crimes of violence and passion," but rather legally complex white collar crimes, pretrial publicity would make little impression on most citizens. Br. for the United States (hereinafter Govt. br.) at 76–77. Haldeman, on the other hand, maintains that the publicity was such as to arouse strong personal feelings in all who came in contact with it:
>
> > Each citizen and thus each prospective juror was led to believe that his security and way of life was [*sic*] personally threatened by what these appellants had done. There could be no sympathy for them. The publicity was calculated to inspire the jurors with a high sense of duty involving much more significant issues than bringing some petty criminal to justice. They were made to feel that they were patriots repelling an attack on their country by an enemy within the gates. * * *
>
> Haldeman reply br. at 12. After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only have guessed.

The Court will accordingly defer ruling on the motion at bar until the Court and the parties have had an opportunity to better assess the defendant's claim of adverse pretrial publicity "by examining the panel drawn to hear the case." *United States v. Brown, supra.* The Court would advise the litigants, however, that it intends to employ a detailed and comprehensive *voir dire* questionnaire, similar to that utilized in the first trial, as an initial means of ascertaining the extent of the veniremen's exposure to the publicity in issue and the effect such exposure may have had. The questionnaire shall be administered to the prospective jurors on May 18, 1981, and copies of the completed forms shall thereupon be promptly made available to the parties. The Court shall subsequently extend to the litigants, by not later than May 22, 1981, an opportunity to present argument in support of their respective contentions. The Court shall thereafter determine either that a change of venue is warranted or, alternatively, that final disposition of the defendant's motion should await further *voir dire* proceedings, which, if conducted, shall consist of oral examination of the prospective jurors.

In assessing the instant motion, the Court has considered the defendant's assertion that juror exposure to media coverage *during* the retrial of this cause, as distinguished from exposure of a pretrial origin, *see Goins v. McKeen*, 605 F.2d 947 (6th Cir. 1979); *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978), may also serve to jeopardize the defendant's right to a fair trial. While the Court shares the defendant's legitimate concern that the publicity certain to accompany the impending retrial may ultimately reach and conceivably contaminate the jury, the Court is not currently persuaded that a change of venue represents the appropriate safeguard to be employed. Indeed, it would appear to the Court that sequestration of the jurors constitutes a viable alternative which can adequately ensure that the members of the jury are in fact insulated from the media coverage which will assuredly attend the retrial of this action.[1] In the event then that the Court ascertains that the pretrial publicity here in issue is not of such a nature as to preclude the impaneling of a

---

1. It has been recognized, of course, that sequestration not only serves to protect the jury from exposure to publicity occurring during the trial but also assists in "dissipating the impact of pretrial publicity". *Nebraska Press Associa-*

fair and impartial jury in this particular forum, the Court shall seriously consider the use of sequestration as a means of ensuring that the retrial of this cause proceeds untainted by juror exposure to potentially prejudicial "during trial" publicity.

In accordance with the foregoing, the Court hereby defers ruling on the defendant's motion for a change of venue until the appropriate instance at trial. In preparation for the first phase of the *voir dire* examination, however, the parties are hereby Ordered to submit for the Court's consideration, on or before March 2, 1981, any and all proposed questions and inquiries the litigants are desirous of having incorporated within the written *voir dire* questionnaire. Each party shall, if appropriate, respond in opposition to any of its adversary's proposals by not later than March 16, 1981.

IT IS SO ORDERED.

## ON SUBSEQUENT MOTION TO EXCLUDE FROM VENIRE

■ Presently before the Court is the motion of the plaintiff City of Cleveland to exclude from jury service all veniremen who indicate, in the course of completing the *voir dire* questionnaire, that the anticipated length of the retrial will serve to impose a personal hardship in the event such individuals are selected to serve. Defendant The Cleveland Electric Illuminating Company (CEI) has, by memorandum of June 2, 1981, responded in opposition.

In the course of the first trial of this cause, the Court did indeed accede to the parties' *joint* request to indiscriminately exclude from the venire each and every individual who advised the Court that jury service in the rather protracted trial proceeding would, for whatever reason, constitute a personal hardship. It is now apparent, however, that the circumstances which originally prompted the Court to permit the automatic disqualification of prospective jurors professing hardship—namely, the fact that counsel for both sides agreed to the exclusion—will not obtain with respect to the impending retrial proceedings. Indeed, CEI has taken the position that the

procedure agreed upon and accordingly utilized in the first trial should be abandoned in favor of proceeding on a juror-by-juror basis, thereby enabling the Court and the parties to specifically explore and individually assess the various claims of personal hardship.

It is, of course, firmly established that the trial court is vested with broad discretion in determining the sufficiency of challenges to prospective jurors. *Dennis v. United States*, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950); *Cox v. General Electric Co.*, 302 F.2d 389, 391 (6th Cir. 1962); *United States v. Anderson*, 509 F.2d 312 (D.C.Cir.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); *Anderson v. Dun & Bradstreet, Inc.*, 543 F.2d 732, 734 (10th Cir. 1976); *United States v. Ploof*, 464 F.2d 116, 118 n.4 (2d Cir. 1972); *Neveaux v. Central Gulf Steamship Corp.*, 503 F.2d 961 (5th Cir. 1974); *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 934 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Gullion*, 575 F.2d 26, 29 (1st Cir. 1978); *United States v. Brown*, 540 F.2d 364, 379 (8th Cir. 1976); *United States v. LePera*, 443 F.2d 810, 812 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). This tribunal, in the exercise of its discretion, is persuaded that the interests of justice will be best served by individually assessing the veniremen's respective claims of personal hardship in determining whether the exclusion of particular members of the jury panel is in fact warranted. The Court would observe in this regard that the statutory language of 28 U.S.C. § 1866(c), which confers upon the district court the power to excuse "any person summoned for jury service . . . upon a *showing* of undue hardship or extreme inconvenience", *id.*, (emphasis supplied), implicitly authorizes the trial court to make inquiry of the prospective jurors for the purpose of satisfying itself that a genuine basis for the asserted hardship does indeed exist. In the absence of a contrary agreement on the part of counsel for the respective parties then, the Court shall, in accordance with the provisions of 28 U.S.C.

*tion v. Stuart*, 427 U.S. 539, 564, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976).

§ 1866(c), and in lieu of accepting without question each and every claim of personal hardship, undertake to probe in some detail the nature and extent of the professed hardship in determining whether a sufficient showing of "undue hardship or extreme inconvenience" has in fact been adduced.

For the foregoing reasons, the Court concludes that the motion of the plaintiff to categorically exclude from the venire each and every individual who, for whatever reason, indicates in the course of completing the *voir dire* questionnaire that jury service in the within action will constitute a personal hardship is without merit and properly denied.

IT IS SO ORDERED.